1

2

3

4

5

**PERKINS COIE** LLP
BRIAN P. HENNESSY (No. 226721)
bhennessy@perkinscoie.com
J. PATRICK CORRIGAN (No. 240859)
pcorrigan@perkinscoie.com
3150 Porter Drive
Palo Alto, CA 94304-1212
Telephone:  650.838.4300
Facsimile:  650.838.4350

6

7

Attorneys for Plaintiff
Ivy Bridge University, LLC

8

9

10

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

11

12

13

IVY BRIDGE UNIVERSITY, LLC f/k/a
Ivy Bridge College, LLC, a Delaware
corporation,

14

Plaintiff,

15

v.

16

17

HIGHER LEARNING COMMISSION, an
Illinois corporation, and Does 1 through
25, inclusive,

18

Defendant.

Case No.

**COMPLAINT FOR:**

(1) Intentional Interference With Contractual
Relations; (2) Intentional Interference With
Prospective Business Interests; (3) Negligent
Interference With Prospective Business
Interests; (4) Inducing Breach of Contract;
(5) California Unfair Competition.

DEMAND FOR JURY TRIAL

19

20

21

22

23

24

25

26

27

28

Plaintiff Ivy Bridge University, LLC f/k/a Ivy Bridge College, LLC ("Ivy Bridge") files this Complaint against Defendant Higher Learning Commission ("HLC"), alleging as follows:

## Background

### A.      Low Completion And High Cost: American Higher Education Is Broken, Especially For Low Income And Minority Students.

1.      Completion rates at colleges and universities are incredibly low.  Only 59% of students starting at a four-year degree institution complete within six years.  Nearly 25% of freshman at four-year institutions leave before the second year.

2.      Two-year colleges—often referred to as community colleges—are "open access institutions" and often represent the only option for many of our nation's students.  But they are failing, too.  Only 31% of students graduate within three years.

3.      The problem is exacerbated for minority students.  Only 40.2% of African-American students at four-year institutions graduate within *six years*.  At two-year colleges, only 26.4% graduate within *three years*.

4.      36% of all community college students are the first in their family to go to college.  As a result, many are at a disadvantage in navigating the college system as compared to those students whose parents and family understand and have graduated from college.  For these students, community colleges are often the last and only chance for them to obtain a college degree.

5.      Traditional community colleges do not work very well as feeders to four-year institutions, either.  Transfer rates are incredibly low.  While meant to be a low-cost flexible option as an entry point to a bachelor's degree, only 16.2% of students who start at a two-year college receive a bachelor's degree from a four-year institution, even after *six years*.  And nearly half of all transfer students that do transfer lose some or all of their college credit in the process.

6.      Meanwhile, costs are out of control.  Tuition and fees have outpaced inflation by five fold over the past 25 years.  Cumulative student loan debt is now over a trillion dollars, higher than cumulative credit card debt.  Thus, not only are our nation's institutions failing to graduate a large portion of their students, they are leaving them in massive debt.  Average tuition

and fees for public four-year colleges have grown to $9,139 for students in state and $22,958 for students out of state, while non-profit private schools charge upwards of $30,000 per year.

7.     The result is an exacerbating cycle that weighs heavily against those students from low income, underprivileged backgrounds.  While college represents their best hope to a higher earning career, their chances of success remain low and they are actually more likely to come out of higher education institutions with a lot of debt and no degree.

**B.     The United States Economy Is Dependent On A World-Class System Of Higher Education.**

8.     Workplace success depends on education.  Median annual wages are over $20,000 greater for jobs requiring at least an associate degree compared to those with no college degree.

9.     Among so-called "millennials," over 20% of those with only a high school degree live in poverty.  Yet among the same generation, only 6% of those with a bachelor's degree or higher live in poverty.  Across the entire workforce, the unemployment rate is more than 2% lower for those with at least a bachelor's degree.

10.     The United States of America is losing its edge as the world leader in higher education.  Currently, the US ranks 5th in educational attainment for people ages 25-64, but only 12th for young people ages 25-34.  Only 28% of all adults over age 25 in the country have a bachelor's degree.  Meanwhile, by 2018, nearly 63% of jobs will require at least some college.  And demand for educated workers is quickly outpacing the supply.  At this moment, there are already nearly four million open jobs.  Our current higher education system is not meeting this need.

**C.     Ivy Bridge of Tiffin University: A Solution.**

11.     Ivy Bridge of Tiffin was created to solve some of these problems.  The majority of Ivy Bridge's students were from low income, underprivileged backgrounds.  Ivy Bridge of Tiffin was the perfect solution because it combined the faculty and coursework of Tiffin University—a 127-year-old four-year accredited university—with the convenience and flexibility of an online environment.  This allowed students, particularly those from low income

and traditionally underrepresented backgrounds in higher education, the flexibility to work part-time and full-time jobs while attending the school.

12.   Once it was up and fully running, Ivy Bridge's time to graduation was roughly **double** the speed than the average transfer college and, based on public indicators, Ivy Bridge was markedly better at successfully transferring its students to four-year universities.  Ivy Bridge was a huge success by anybody's standard.  It served dozens of students in California, and students from most of the states in the US.

13.   Ivy Bridge accomplished its success in a number of different and innovative ways, including by providing each of its students with mandatory tutors; entering into agreements with a multitude of different four-year universities that guaranteed their students' acceptance into these universities so long as the students earned an agreed upon GPA for certain course work; and creating proprietary software that allowed its students to easily track the courses they needed to take and the grades they needed to achieve to be guaranteed acceptance into the four-year university of their choice.

14.   Despite Ivy Bridge's incredible success, however, it was forced out of business by Defendant HLC because Ivy Bridge did not fit within HLC's political agenda.

**D.   HLC First Embraces, And Then Destroys Ivy Bridge.**

15.   HLC is an accrediting body.  It wields enormous clout and power, because without accreditation, a university cannot facilitate federal financial aid for its students.  In addition, accreditation carries with it a certain level of prestige such that degrees from unaccredited universities are viewed as not very useful or worthwhile.  In sum, accreditation is the "seal of approval" without which a university cannot meaningfully operate.

16.   At first, HLC completely supported and approved the relationship between Tiffin and Ivy Bridge.  When presented with Ivy Bridge in 2007, HLC completely supported it and provided the requisite accreditation.

17.   Then, in 2010, HLC did its Ten Year Review of Tiffin, which included a special focus on the Ivy Bridge relationship.  The Ten Year Review is the most intense review done by

HLC, and occurs every ten years for accredited institutions. Ivy Bridge passed with flying colors. It got strong marks all around:

- The concept of the Ivy Bridge partnership is an excellent strategic initiative. It addresses an underserved population through a strong curriculum, efficient and effective academic support, excellent instruction, and a very good online portal for program delivery.

- Ivy Bridge College delivers quality education to a relatively underserved population. Its staff support concept is innovative and well received by the students.

- It is evident that the University is embracing innovation and change with regard to on-line programs and Ivy Bridge entrepreneurship ventures. The University has stayed true to its mission in these new opportunities. Its focus on career oriented disciplines such as business and criminal justice is clear evidence of programs that support the mission.

- TU [Tiffin University] effectively utilizes strategic alliances/partnerships to develop and grow academic programs and to expand its local, national, and global presence. These alliances have been particularly effective in the success of the online Associates Degree programs and the International master's and bachelor's degree programs. [Referring to Ivy Bridge.]

- Tiffin's Ivy Bridge partnership and its European alliances are clear examples of using external relationships to further the mission of the University and stabilize the financial condition.

18. During the Ten Year Review, Ivy Bridge disclosed to HLC its future plans. Specifically, it disclosed that eventually it would request independent accreditation as opposed to being accredited as a branch campus of Tiffin. At that time HLC said nothing other than that Ivy Bridge was doing well. Little did Ivy Bridge know, however, a political wave was coming to sweep it away.

19. Beginning approximately in 2010, non-traditional universities started receiving bad press. This was in the midst of the financial crisis of the time and the pundits pounced. The original focus was a specific model of "for-profit" colleges whereby a traditional university in financial distress would be purchased by a for-profit entity that would then turn it into a money making enterprise. This model, so the story went, was proliferating during the financial crisis and was a problem.

20. Then the congressional hearings began. The press narrative bled into the Senate, which called the head of HLC, Sylvia Manning, before it for testimony. That did not go well for

Ms. Manning. She left the Senate with HLC under pressure to show that it shared the press's concerns about for-profit colleges and that it was going to do something about it.

21.     But there was a problem. HLC had already accredited many of the for-profit universities that sprung from the failing traditional schools. It could not simply revoke that accreditation. Instead, it had to find a new target to show that it could "get tough."

22.     That is where Ivy Bridge came in. It was at the wrong place at the wrong time. The Ivy Bridge model was totally different than the for-profit model that was getting bad press. Ivy Bridge was a partnership with Tiffin University to create a transfer university accessible to all. It was not a situation in which a failing university was "bought out" by a for-profit enterprise that was then spun into a profit making machine. However, the Ivy Bridge relationship was non-traditional and it was in a position as technically a branch campus of Tiffin that HLC thought it could exploit to show those putting pressure on it that it would take action against non-traditional providers of higher education. What HLC did next was a complete sham.

23.      Early in 2012, HLC feigned surprise at the Ivy Bridge structure and demanded that Tiffin submit to a "change of control" review. This is the most stringent category of accreditation review, and it typically is only called for when there is an actual *change in control*. HLC latched on to the fact that Ivy Bridge and Tiffin intended to eventually seek independent accreditation for Ivy Bridge, as opposed to its current branch campus accreditation status, as a pretext for change in control review.

24.     Really, this was a subterfuge to shut down Ivy Bridge of Tiffin and destroy the relationship and agreements between Tiffin and Ivy Bridge for no justifiable reason. HLC had been aware for years of the plan to eventually seek independent accreditation for Ivy Bridge—including in 2010 when the Ivy Bridge relationship received glowing reviews.

25.     But at the time Ivy Bridge and Tiffin did not know this was all a sham and complied with HLC's review while noting, however, that HLC had been kept fully aware of Ivy Bridge, its structure, operations, and relationship with Tiffin, throughout the previous four years, all of which was met with nothing but praise from HLC.

26.     The change in control review process included an "on site" visit and inspection, which itself revealed the sham nature of the entire process. HLC brought only four inspectors— two members of HLC and two others, none of whom had any experience with or knowledge of Ivy Bridge-type arrangements, or even community colleges. After a two-day visit, the inspectors met with representatives from Ivy Bridge and Tiffin. They expressed some concerns about the review, but nothing particularly dire or dramatic. Ivy Bridge representatives noted that they would be willing to consider abandoning the plan to seek independent accreditation if HLC desired. But the inspectors responded that there was no need for that and they would follow-up shortly with a formal report of the review.

27.     The report was a complete hatchet job. The glowing praise from a few years earlier turned into universal disdain. Where the prior review said, for example, that Ivy Bridge had "a strong curriculum, efficient and effective academic support, [and] excellent instruction," this one said that the Ivy Bridge courses were of "poor quality" and "lacking in content." Likewise, Tiffin's once "effective utilization" of alliances like Ivy Bridge turned into a "lack of faculty oversight" and a "failure to demonstrate responsibility" for Ivy Bridge.

28.     But the only thing that had changed in the intervening years was *more time and money* being invested in the Ivy Bridge curriculum. Ivy Bridge and its classes, faculty, and curriculum had by any objective standard improved since the prior review.

29.     The truth, of course, is that one other thing had changed in those interim few years: HLC was getting political pressure to punish any non-traditional form of higher education. Never mind that Ivy Bridge "addresses an underserved population through a strong curriculum, efficient and effective academic support, excellent instruction, and a very good online portal for program delivery"—***those are HLC's words***. HLC was under political pressure to kill non-traditional higher education, so that's what it did. This was a witch-hunt and Ivy Bridge was the victim.

30.     But there is more. In response to the fabricated criticisms in the change of control review, Ivy Bridge and Tiffin agreed to abandon the plan to seek independent accreditation.

1  They would just continue in the same manner—a branch campus of Tiffin—that led to the

2  glowing reviews of Ivy Bridge just a few years prior.

3          31.     Telling of its true intent, HLC rejected outright that plan.  It threatened Tiffin with

4  sanctions if it did not completely sever its ties with Ivy Bridge.  In other words, complete

5  shuttering of Ivy Bridge was the only outcome that HLC would accept.  If Tiffin refused, then

6  Tiffin itself faced the prospect of losing its accreditation, which would be a death sentence for

7  the 127-year-old institution.

8          32.     And that is how it ended.  HLC forced Tiffin to break its agreements with Ivy

9  Bridge and shut down the Ivy Bridge relationship.  HLC did not just threaten Tiffin with Ivy

10 Bridge-related sanctions.  It threatened sanctions all up and down Tiffin's operations—even

11 those that had nothing to do with Ivy Bridge—if it did not break its agreements with Ivy Bridge.

12 Again telling of HLC's true intent to destroy Ivy Bridge, however, soon after Tiffin backed out

13 of the Ivy Bridge relationship, HLC did another review of Tiffin that passed with flying colors.

14 In other words, the only reason Tiffin faced crippling sanctions from HLC was Ivy Bridge.

15         33.     After HLC destroyed Ivy Bridge, Ivy Bridge sought to partner with at least two

16 other four-year universities to revive itself.  These schools were Concordia University and Ohio

17 Christian University.  Each school was willing to start an Ivy Bridge-like institution, but each

18 was threatened by HLC with sanctions if they did.  So intent was HLC on burying Ivy Bridge

19 that it threatened to destroy anyone or anything that got in its way.

20         34.     Had HLC not blackballed Ivy Bridge, it would have gone on to serve hundreds of

21 thousands and even millions of low income, underprivileged students.  By all relevant measures,

22 Ivy Bridge was a huge success prior to HLC's decision to blackball Ivy Bridge, with roughly

23 *half* the time to graduation and ***50-100%*** more success at transferring its students to four-year

24 universities.  The result would have been a school that gave low income, underprivileged

25 students a fighting chance at one day obtaining higher incomes and getting themselves and their

26 families out of poverty.  Ivy Bridge would have gone on to help hundreds of thousands to

27 millions of students transfer to four-year universities in the short term, and in the long term, it

28

would have become a stand-alone university with a successful track record built on helping those that needed it the most.

35.     But HLC stopped all of that when it decided to go on a witch-hunt to destroy Ivy Bridge.  In the end, HLC succeeded in destroying Ivy Bridge and ruining its ability to operate, its reputation, and its ability to continue as an entity.  This damaged Ivy Bridge in a variety of ways, including but not limited to, destroying its (1) short term ability to partner with Tiffin and operate a transfer college; and (2) long term ability to establish a stand-alone university.  Ivy Bridge would have served hundreds of thousands to millions of students under either and/or both scenarios.  In addition, HLC damaged Ivy Bridge's reputation so badly that no other school would partner with it.  The precise amount of money owed to Ivy Bridge is to be determined at trial.

**D.     HLC's Actions Were Unauthorized, Wrongful, and Contrary to Law.**

36.     In order for students to obtain loans guaranteed by the federal government, they must attend schools that are accredited.  However, the federal government does not accredit schools directly.  Instead, the federal government deputizes certain accrediting agencies, such as HLC.  These agencies then apply standards that they create to accredit schools.  Once a school gets accredited, its students can receive loans from the federal government.  The accrediting agencies have an enormous amount of power, since they essentially hold the key to obtaining federal funding.

37.     Given this reality, the accrediting agencies are not allowed to simply run rampant and do whatever it is they want, like HLC did with Tiffin and Ivy Bridge as alleged herein.

38.     Instead, the accrediting agencies are required to follow certain rules as set forth by law.  For instance, the law requires that an accrediting agency's decision not be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or reached without observance of procedure required by law.  Also, an accrediting agency is required to follow its own rules.  This means an accrediting agency, like HLC, cannot just disregard its own rules and refuse to accredit a school simply because it does not like a particular school or does not want that school to be accredited for political reasons.

39.     In this case, HLC utterly failed to follow all of the above legal standards.

40.     As alleged herein, HLC pre-determined it was going to blackball Ivy Bridge at all costs by exerting its enormous leverage over Tiffin.  HLC forced an unnecessary and unwarranted change of control review as a pretext to kill the Tiffin/Ivy Bridge relationship.  HLC threatened to take away Tiffin's accreditation if it continued to deal with Ivy Bridge in any capacity and produced a report that was littered with fabrications specifically targeted at destroying the Ivy Bridge/Tiffin relationship.

41.     HLC also blackballed Ivy Bridge by exerting its leverage over Concordia University and Ohio Christian University.  When HLC discovered that these universities were working with Ivy Bridge, HLC communicated to each university that it would sanction it if it continued a relationship with Ivy Bridge.  As a result, both universities backed out of their respective relationships with Ivy Bridge.

42.     HLC's actions were arbitrary, capricious, and an abuse of discretion.  HLC failed to observe the procedures required by law and failed to follow its own rules and procedures.

43.     HLC's actions destroyed Ivy Bridge as alleged herein.

44.     At all relevant times, HLC acted purposefully and with the intent to destroy Ivy Bridge and its relationship with Tiffin, which it knew and intended would harm and injure Ivy Bridge in California.  HLC's actions did, in fact, cause significant harm in California, including to the many students Ivy Bridge served in California and to Ivy Bridge itself, which is headquartered in California, and was forced to cease operations as a result of HLC's conduct.

## PARTIES, JURISDICTION, AND VENUE

45.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §1332.  Ivy Bridge is a Delaware company with its principal place of business in San Francisco, California.  On information and belief, HLC is an Illinois corporation with its principal place of business in Chicago, Illinois.  The amount in controversy exceeds $75,000.

46.     Does 1-25 are persons or entities responsible in whole or in part for the wrongdoing alleged herein ("Doe Defendants").  Ivy Bridge is informed and believes, and based thereon, alleges that each of the Doe Defendants participated in, ratified, endorsed, or was

1  otherwise involved in the acts complained of, and that they have liability for such acts. Ivy

2  Bridge will amend this Complaint if and when the identities of such persons or entities and/or the

3  scope of their actions become known.

4       47.    Venue is proper in this District under 28 U.S.C. §1391 because a substantial part

5  of the events or omissions giving rise to these claims occurred in this District.

6       48.    Intradistrict Assignment. Pursuant to Local Rules 3-5(b) and 3-2(c)-(d), this

7  action should be assigned to either the San Francisco Division or Oakland Division of this Court

8  because a substantial part of the events or omissions which give rise to the claims occurred in the

9  county of San Francisco.

10       49.    During all relevant times, HLC maintained and maintains a substantial and

11  pervasive presence in California. Specifically, HLC conducts accrediting business and

12  operations throughout the state. That, on information and belief, includes many visits by HLC

13  representatives to campuses throughout the state, as well as a nearly constant stream of

14  communications and interactions with campuses in California. Examples of institutions

15  accredited by HLC with campuses in California include the University of Phoenix (29 campuses

16  in California), DeVry University (15 campuses in California), Everest College (12 campuses in

17  California), Argosy University (14 campuses in California), and many others.

18       50.    HLC representatives visit every single one of these campuses on a regular basis to

19  conduct its accrediting processes and business. It also regularly communicates and conducts

20  reviews and other business with representatives from these universities and campuses in

21  California.

22  **First Claim For Relief**

23  **Intentional Interference With Contractual Relations**

24       51.    Ivy Bridge realleges and reincorporates each of the preceding paragraphs as if

25  fully set forth herein.

26       52.    Fully enforceable and valid contracts existed between Ivy Bridge on the one hand

27  and Tiffin, on the other, which are attached hereto as Exhibits A-D (the "Agreements").

28

Perkins Coie LLP
Attorneys At Law
Palo Alto

53.     Defendant was fully aware of and had full knowledge of the Agreements and the concomitant Ivy Bridge venture.

54.     Through its wrongful and unjustified actions described above and incorporated by reference herein, Defendant intended to induce and cause Tiffin to breach the Agreements.

55.     Through its actions described above and incorporated by reference herein, Defendant did cause Tiffin to breach the Agreements.

56.     Tiffin's breach of the Agreements, caused by Defendant, caused injury to Ivy Bridge in the form of lost revenue, profits, enterprise value, among other injuries and damages.

**Second Claim For Relief**
**Intentional Interference With Prospective Business Interests**

57.     Ivy Bridge realleges and reincorporates each of the preceding paragraphs as if fully set forth herein.

58.     Ivy Bridge and Tiffin were in an economic relationship in the form of the Ivy Bridge joint venture, which would have resulted in a continued economic benefit to Ivy Bridge, including revenue, profits, enterprise value, among other injuries and damages.

59.     Defendant knew of and was fully aware of that economic relationship.

60.     Defendant engaged in the wrongful and unjustified acts described above and incorporated by reference herein with the intent to disrupt and destroy that economic relationship and / or knew that as a result of its actions such disruption was certain or substantially certain to occur.

61.      The economic relationship between Ivy Bridge and Tiffin was disrupted as a result of Defendant's wrongful and unjustified acts.  That disruption harmed Ivy Bridge by causing it to lose revenue, profits, enterprise value, among other injuries and damages. Defendant's wrongful and unjustified acts therefore directly caused and / or were a substantial factor in causing Ivy Bridge's harm.

62.     Ivy Bridge had existing economic relationships with Concordia University and Ohio Christian University that would have resulted in an economic benefit to Ivy Bridge, including revenue, profits, enterprise value, among other things.

63.     Defendant knew of and was fully aware of these economic relationships.

64.     Defendant engaged in the wrongful and unjustified acts described above and incorporated by reference herein with the intent to disrupt and destroy these economic relationships and / or knew that as a result of their actions such disruption was certain or substantially certain to occur.

65.     The economic relationships between Ivy Bridge and Concordia University, and Ivy Bridge and Ohio Christian University, were disrupted as a result of Defendant's wrongful and unjustified acts.  That disruption harmed Ivy Bridge by causing it to lose revenue, profits, enterprise value, among other injuries and damages.

66.     Defendant's wrongful and unjustified acts therefore directly caused and / or were a substantial factor in causing Ivy Bridge's harm.

### Third Claim For Relief
### Negligent Interference With Prospective Business Interests

67.     Ivy Bridge realleges and reincorporates each of the preceding paragraphs as if fully set forth herein.

68.     Ivy Bridge and Tiffin were in an economic relationship in the form of the Ivy Bridge joint venture, which would have resulted in a continued economic benefit to Ivy Bridge, including revenue, profits, enterprise value, among other things.

69.     Defendant knew or should have known of that economic relationship.

70.     Defendant knew or should have known that if it did not act with reasonable care in connection with the acts described above and incorporated herein by reference, then it would interfere with the economic relationship between Ivy Bridge and Tiffin.

71.     Defendant knew or should have known that this interference with the economic relationship between Ivy Bridge and Tiffin would cause Ivy Bridge to lose in whole or in part the probable future economic benefits that would result from the economic relationship between Ivy Bridge and Tiffin.

72.     Defendant did not act with reasonable care and was negligent in performing the acts described above and incorporated by reference herein.

73.     Defendant's negligence and lack of reasonable care in performing the acts described above and incorporated by reference herein caused harm to Ivy Bridge in that the economic relationship was disrupted and therefore Ivy Bridge lost the economic benefits and advantages expected therefrom.

## Fourth Claim For Relief
### Inducing Breach Of Contract

74.     Ivy Bridge realleges and reincorporates each of the preceding paragraphs as if fully set forth herein.

75.     Fully enforceable and valid Agreements existed between Ivy Bridge on the one hand and Tiffin, on the other, which are attached hereto as Exhibits A-D.

76.     Defendant was fully aware of and had full knowledge of the Agreements and the concomitant Ivy Bridge venture.

77.     Through its wrongful and unjustified actions described above and incorporated by reference herein, Defendant intended to induce and cause Tiffin to breach the Agreements.

78.     Through its actions described above and incorporated by reference herein, Defendant did cause Tiffin to breach the Agreements.

79.     Tiffin's breach of the Agreements, caused by Defendant, caused injury to Ivy Bridge in the form of lost revenue, profits, enterprise value, among other injuries and damages.

## Fifth Claim For Relief
### California Unfair Competition
### Cal. Bus. & Prof. Code § 17200, *et seq.*

80.     Ivy Bridge realleges and reincorporates each of the preceding paragraphs as if fully set forth herein.

81.     By the acts described herein, HLC has engaged in unlawful and unfair business practices that have injured and will continue to injure Ivy Bridge in its business and property, in violation of California Business and Professions Code Section 17200, *et seq.*

82.     HLC's acts alleged herein have caused monetary damages to Ivy Bridge in an amount to be proven at trial.

## **Prayer for Relief**

WHEREFORE, Ivy Bridge prays that judgment be entered in its favor and against Defendant, as follows:

1.     An award to Ivy Bridge of restitution and damages, including, but not limited to, compensatory and punitive damages, and all other damages permitted by law;

2.     For such relief as the Court deems just and proper.

DATED:  May 14, 2015           **PERKINS COIE** LLP


By:  /s/ Brian P. Hennessy
     Brian P. Hennessy (SBN 226721)
     BHennessy@perkinscoie.com
     J. Patrick Corrigan (SBN 240859)
     PCorrigan@perkinscoie.com

     Attorneys for Plaintiff
     Ivy Bridge University, LLC

1

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial of all issues in the above-captioned action that are triable to a jury.

DATED:  May 14, 2015                    **PERKINS COIE** LLP


By:  /s/ Brian P. Hennessy
     Brian P. Hennessy (SBN 226721)
     BHennessy@perkinscoie.com
     J. Patrick Corrigan (SBN 240859)
     PCorrigan@perkinscoie.com

     Attorneys for Plaintiff
     Ivy Bridge University, LLC